ORIGINAL

U.S. District Court

District of Delaware

Robert W. Warrington

v.

Carroll et al

Case Number: 1:06-cv-67

(SLR)



FILED

FEB 28 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Memorandum in Support of Petition Under 28 U.S.C.
§ 2254 For Writ of Habeas Corpus By A Person
In State Custody

# TABLE OF AUTHORITIES

28. U.S.C. § 2254                                3

U.S.C.A. Const. Amend 5                   throughout

U.S.C.A. Const. Amend 6                   throughout

U.S.C.A. Const. Amend 14                  throughout

## Nature And Stage Of The Proceedings

Petitioner is an inmate at the Delaware Correctional Center. On November 27, 2001, petitioner was convicted of one count of Murder in the First degree, one count of Possession of a deadly weapon during the commission of a felony (Knife), and one count of Conspiracy in the First degree. On January 18, 2002, petitioner was sentenced to Natural Life plus Twenty-Five years. A notice of direct appeal was filed, with a brief submitted August 2, 2002. A decision was docketed March 3, 2003, and the petitioner was notified March 25, 2003. On February 24, 2002, petitioner filed a motion for post conviction relief pursuant

to Delaware Superior Court Criminal Rule 61. This

motion was denied January 3, 2005, after which a

notice of appeal to the Supreme Court of the State

of Delaware was filed January 31, 2005. The appeal

was denied on January 24, 2006. A timely petition

under 28 U.S.C. § 2254 for writ of Habeas Corpus was

filed on January 24, 2006. This is the petitioner's brief.

3

# SUMMARY OF THE ARGUMENTS

WHETHER THE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT PRE-TRIAL STAGE, TRIAL STAGE, AND APPEAL STAGE OF THE PROCEEDINGS.

WHETHER THE PETITIONER WAS CONVICTED THROUGH THE USE OF STATEMENT ELICITED IN VIOLATION OF DUE PROCESS.

WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION.

WHETHER THE JURY INSTRUCTIONS WERE FAULTY.

WHETHER THE PETITIONER WAS DENIED COUNSEL AT RULE 61 POST CONVICTION RELIEF EVIDENTIARY HEARING.

4

# STATEMENT OF THE FACTS

On August 14th, Jesse Pecco entered the house of Robert W. Warrington and Andrew E. Warrington. He was both uninvited and unexpected. The house, which was also the residence of their father, was a sanctuary that they valued greatly, and the location was unknown to others, (See App. 1).

The intruder was known to the defendants, and his reputation for violence was known as well. Of particular note was the gunfire on the Rehoboth Boardwalk that Mr. Pecco was involved in, (See App. 2).

Mr. Pecco first attacked Robert W. Warrington (Wes), who was of the habit of talking his way out of conflicts, (See App. 3). At this point, the intruder had already threatened Wes's life while on the porch of Peter Harlow's trailer, whose testimony of the event claims that the conversation was "about nothing", (See App. 4). Mr. Harlow also testified to the fact that Wes had just given him $500 to give to the future intruder, Mr. Pecco, (See App. 5). Mr. Harlow also testified to a meeting scheduled at a nuetral place, on Monday morning, in order to settle the supposed debt, (See App. 6).

Mr. Pecco would smuggle large amounts of Ketamine while on "Vacation", (See App. 7). Mr. Pecco was arrested in Arkansas while smuggling "K", (See App. 8). Mr. Pecco desparately needed money to resolve his arrest, (See App. 9). Mr. Pecco's girlfriend, Ms. Wilson, testified that Mr. Pecco was deathly afraid of going to prison and was trying to raise the money to buy his way out of a long jail term, (See App. 10).

Just prior to the intrusion, the defendants smoked marijuana. Evidence to this fact was jokingly called "broccoli" by the prosecution, (See App. 11). Furthermore, the defendant's blood was drawn directly after the incident, (See App. 12). The results of the test for the time of consumption of marijuana have been omitted from the record.

The intruder attacked Robert W. Warrington. This is not the first record of such an incident. Mr. Pecco attacked his own mother, (See App. 13).

After Mr. Pecco attacked Robert W. Warrington while Robert attempted to talk to him while in his own bedroom, Andrew ran down the stairs and saved his brother's life, (See App. 14). After saving his brother from being stabbed, Andrew was chased back up the stairs by the intruder, who refused to leave, (See App. 15). At the top of the stairs, Mr. Pecco ripped the knife that Robert had disarmed him of in the bedroom, back out of Robert's hands and then proceeded to stab at Andrew, wounding his leg (See App. 16). Robert sustained multiple wounds all over his body, (See App. 17). The last knife wound happened at the top of the stairs, after Robert regained the knife and used it (See App. 18). Robert fell down the stairs, wiping the minimal amount of blood on his hands onto the wall and handrail as he fell, (See App. 19). Mr. Pecco sustained wounds that for the most part bled internally, slowly leaching his strength, but not appearing too serious, (See App. 20),

None of the wounds that Mr. Pecco sustained were mortal, (See App. 21). Wes left his brother at the top of the stairs and ran to his bedroom to call 911. Wes yelled, " Police, Police!", as the intruder barged into his room, now aware that Wes was attempting to call for help, (See App. 22). During the struggle, Mr. Pecco kicked the bedroom wall, trying to stop Wes, (See App. 23).

Mr. Pecco had active, bleeding wounds on his hands, (See App. 24). The telephone that Wes used to call for help had three tiny spots of blood on it, (See App. 25). There was no stain on the phone consistant with actively bleeding wounds.

The phone line was open during the closing of the argument. The defendants and the intruder were in the foyer, the knife was in the bedroom. After the threat had ended, Wes asked Andrew to check to see if he had succeeded in calling for help, while at the same time picking up another phone to call for help. Out of habit, Andrew pressed the talk button, disconnecting them from 911. 911 called back immediatly, (See App. 26). The 911 operator did not identify himself, and thinking that his call for help had failed, as help had not arrived, Wes proceeded under the assumption that he was possibly talking to a customer of his father's Carpet Cleaning business, (See App 27).

While running around trying to find his girlfriend, as well as trying to hide the marijuana paraphanalia, (See App. 28), Andrew finds the knife on the bedroom floor. The knife has Wes's blood on it at the top of the handle from a small wound on his right hand.

7

Andrew then hands the knife to Wes, who later sets it down in the foyer so that the police can easily find it. The paraphanalia was hidden, the knife was out in the open. Andrew left a print, in his brother's blood, at the bottom of the bedroom door, while on his quest to hide the paraphanalia, (See App. 29).

Wes was covered in blood on his clothes from the [*] close contact at the top of the stairs, (See App. 30). Later, Wes sat down on a leather couch, hyper-ventilating as he talked to 911, (See App. 31). A picture of that couch was introduced into evidence, (See App. 32). When the paramedics arrived, they did not try to save the intruder, (See App. 33). Wes was wearing a black sweatshirt, which EMS Myers took off of him and collected as evidence, (See App. 34). Later at the trial, while escorting him into court, the prosecutor asked the paramedic who had collected the most important piece of evidence, that had been mislabeled as belonging to Andrew, whether the sweatshirt that he had collected almost two years prior, was black or tan, (See App. 35). The black sweatshirt was never tested for blood stains on the back. The same paramedic was reluctant to admit that Wes was even wounded, (See App. 36). The officers at the scene caused 99% of the foot prints in blood on the floor, (See App. 37).

The brothers were questioned at Troop 7, Wes while naked except for a sheet, both while intoxicated on Marijuana, afterwhich they were released. Four days later, charges were pressed, and the brothers promptly turned themselves in to achieve vindication.

8

# INTRODUCTION

Out of respect for the officers of the court, the petitioner's memorandum is devoid of all case law, precedent, or argument. These are the claims, and the petitioner is prepared to substantiate them.

Trial counsel failed to act on knowledge, failed to investigate evidence, and was substantially below the standards set forth. The statement used to convict was given while intoxicated, and made with the promise of going home. The easiest part to prove is the fact that the petitioner was held naked but for a sheet, in a freezing basement, then asked to give a statement. The petitioner was unwilling to wait for an attorney if he had to

wait naked and freezing in the basement. He was promised clothes to continue. The Detectives left, returned ten minutes later without the clothes, and continued the questioning. The motivations behind this are clear. The record shows these events happening. Intent to kill was never shown. The prosecution's story does not fit. The jury was improperly instructed, and the previous evidentiary hearings were a farce, intent only on attempting to catch the petitioner at a lie. The petitioner humbly requests further investigation into his claims.

Thank You.

10

# ARGUMENT

I.     THE PETITIONER WAS DENIED EFFECTIVE
       ASSISTANCE OF COUNSEL AT PRE-TRIAL STAGE,
       TRIAL STAGE, AND APPEAL STAGE OF THE PROCEEDINGS

## STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to effective assistance of of counsel was violated, U.S.C.A. Const. Amend. 6.

Trial counsel failed to examine crucial evidence, causing a failure to have the sweatshirt tested for blood on the back, which would have corroborated the petitioner's claim of making the 911 call. Trial counsel failed to motion for change of venue, to sever the trial, or suppress the statement elicited in violation of due process. Trial counsel failed to object to prejudicial statement, "Cold blooded killers", during opening statements. Trial counsel failed to object to the altered 911 tape. Trial counsel failed to object to the admission of photos showing the petitioner's tattoo. Trial counsel advised the petitioner to discuss a prior irrelivant felony. Trial counsel failed to Cross-examine a key witness in Det. Hudson.

11

Trial counsel failed to object to the prosecution coaching a witness in EMS Myers. Trial counsel failed to call prepared witnesses. Trial counsel promoted the petitioner to lie by ommission * by not discussing the smoking of marijuana before the incident * or counsel's prior "Best Friend" relationship Det. Hudson. Trial Counsel failed to object to improper remarks made by prosecution during closing arguments, stating that a smudge was found above the one * when in fact it was above the three. Trial counsel gave the closing away.

Appelant counsel failed to do anything but sign his name to the brief prepared by Co-defendant's Counsel.

# ARGUMENT

## II  THE PETITIONER WAS CONVICTED THROUGH THE USE OF STATEMENTS ELICITED IN VIOLATION OF DUE PROCESS

### STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

The petitioner was promised release in return for a statement. The petitioner was under the mania of marijuana. The petitioner was held naked, freezing, in the basement, and feared further torture if made to wait for a Lawyer. The petitioner was promised clothes to continue, which the detectives left to get, then returned without. The statement was coerced, in violation of Due Process, All of this is supported by the record.

# ARGUMENT

## III   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION

### STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

The encounter was sudden and unexpected. It was reasonable to believe that the intruder would inflict injury or death as he was shouting, "I'll kill you". The intruder was asked to leave and refused. This meets the criteria for Self-defense in one's own home. The home's resident attempted to call for help, and no intent to kill was shown. The intruder had very actively bleeding wounds on his hands, and could not have used the phone in question as it was virtually blood free. The prosecution's claim is not supported by the evidence. The instinct of the officers on the scene was correct. This was a criminal killed by a private citizen, in self-defense, (See App. A-38)

14

# ARGUMENT

## IV     THE JURY INSTRUCTIONS WERE FAULTY

## STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

The jury was improperly instructed as to defense in ones own home.

15

# ARGUMENT

**I**   PETITIONER WAS DENIED COUNSEL AT RULE 61 POST CONVICTION RELIEF EVIDENTIARY HEARING

## STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5,14.

By denying the petitioner Counsel, the state rendered its fact finding procedure inadequate to afford a full and fair hearing. A Federal evidentiary hearing would determine that the state's determination is not supported by the record, and would resolve the dispute.

## Conclusion

In light of the aforementioned, petitioner requests an

evidentiary hearing be ordered so that the lower court decision can

be reversed and the case remanded.

Robert W. Warrington
SBI # 00442182
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE    19977

Dated: February 22, 2006

17