IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

<*>

Robert W. Warrington          <*>
        Petitioner,

                              <*>    Case Number: 1:06-cv-67

    V.                                      (SLR)

                              <*>

    Carroll et al
        Respondents.

                              <*>    EVIDENTIARY HEARING REQUESTED


                              <*>

---

PETITIONER'S TRAVERSE

FILED

JUL 2 8 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD scanned

Robert W. Warrington

Dated: 7-26-06

Robert W. Warrington, pro se
SBI# 00442182
Delaware Correctiona Center
1181 Paddock Rd.
Smyrna, DE    19977

### TRAVERSE

Contrary to the respondent's claim, the petitioner, Robert "Wes" Warrington, and his brother, Andrew "Drew" Warrington, were arrested on August 18, 2000. The brothers had been interrogated and subsequently released on August 14, 2000, and four days later were told that they must turn themselves in at Troop 3, which they promptly did.

Furthermore, the respondent has  compounded the error made by the Delaware Supreme Court during its summation of the facts. Both claim that the brothers claim to have gained the upper hand as the fight proceeded up the stairs, away from the front door, as Mr. Pecco chased "Drew". The petitioner and his brother have always maintained that they only gained the upper hand after "Wes" attempted to call for help, downstairs, and that the only act of violence that occured afterword was "Wes" kicking Mr. Pecco in the face out of anger and frustration and certainly not in cold blood.

But perhaps the most frightening error that both the Delaware Supreme Court and the respondents have made in summarizing the facts is this: They both state that "Drew" claimed to have dialed for help, when in fact "Wes" has always claimed and in fact did call for help by dialing "911". "Drew" has never made this claim. This is an example of just how unfamiliar they were with the facts of the case when this was written.

This is not simple error, but proof that this petitioner's claim has yet to recieve adequate consideration.

1

Under the AEDPA, a federal court is not required to order
a hearing where a petitioner has failed to develop the facts in
state court. In such cases, the federal court accords a pres-
-umption of correctness to facts found by the state court, and
need not hold any evidentiary hearing unless those fact are re-
-butted by clear and convincing evidence.

The facts are as follows: Mr. Warrington, also known as
"Wes", was stripped of his clothing and held naked but for a thin
sheet in a freezing cold concrete basement. "Wes" was then inter-
-rogated, at which time he expressed his ardent desire to not
be returned to the freezing cold room, naked, while a lawyer was
found. Transcripts of the audio tape do not record the event in
its entirety, but a video tape is in existance which records the
Detectives offering to provide the petitioner with clothing, lea-
-ving the room, then retuning without clothing and resuming the
interrogation. These are the facts.

As to any promises made before the interrogation, regarding
being allowed to leave afterword, the Detective whoescorted the
petitioner has never been asked to testify. Also, in regards to
the petitioner's claim of having been under the influence of
marijuana at the time of the interrogation, the petitioner does
not have the resources to substantiate them at this time.

The gravity of this case and the constitutional violations
that are enclosed is such that unless remanded, this case will
in the future be used as precedent for Detectives acting under
the color of law to knowingly overbear the will of the interr-
ogated to resist by stripping them of all clothing and breaking

the interrogated through the use of extreme temperatures. State-
-ments aquired that way cannot be regarded as the product of
a rational intellect and free will.

The Detectives had clothing available the entire time and
yet chose to interrogate the petitioner as he was. This exibits
a knowledgable forthought by the police to aquirea statement
without regard to the truthfulness or reliability of the state-
-ment. These tactics bring to mind the same tacticts being used
by the military in the holding camps in Cuba.

It is the respondent's opinion that this behavior is acce-
-table. Furthermore, the respondent is of the opinion that the
Lower Court correctly applied the two-pronged standard set forth
in Strickland by ruling that any percievable errors made by trial
counsel were mere trial strategy. The Respondent then goes on to
claim that trial counsel's unproffessional errors played no part
in the defendant pleading guilty. The petitioner did not plead
guilty. The petitioner requested a trial in the hopes of being
vindicated through the process of a fair adversarial system.

According to the respondent, trial counsel corrected his
error in having failed to examine or have tested a key piece
of evidence (Black Sweatshirt) before the trial by cross-examin-
-ing the officer who had collected it.

The clothing removed from "Wes" at the scene was collected
by an EMS Technician. This key piece of evidence was never tested
and corrroborates the petitioners account by displaying blood
stains on the back. It is not unreasonable for the petitioner
to expect trial counsel to examine and have tested key pieces of

3

evidence.

The respondent has stated that the petitioner's claim has been properly handled in the lower courts. The previous eviden- -tiary hearing was adequate, and all subsequent claims are barred because trial counsel was found to be adequate and therfore raised all necessary grounds during trial. This in turn procee- -duraly bars any claim that the petitioner has.

The petitioner cannot argue with the cold logic of that one. If the lower court wishes to prevent a case from being fully examined by a Federal Court, all that is necessary is for an evi- -dentiary hearing to be held. Counsel for the defendant need not be provided, and any decisions made are final.

The only remedy for such a case is when clear evidence is provided.(App. 1).

How fortunate for the petitioner that such evidence is clear and on the record.

The claim can be summarized as such: The Constitution provides for effective assistance of counsel. The petitioner was represented by counsel who provided ineffective assistance by failing to suppress a clearly suppressable statement, failing to examine or have tested a key piece of evidence, as well as many other examples of errors that are against reasonable judgement. The trial, absent of these errors would have allowed the fact finders to make a decision free from the taint of a coerced confession and with all of the facts that the key piece of evidence would have provided.

The lower court then held an evidentiary hearing to determine

4

the existance of any merit to the petitioner's claim. At the evi-
-dentiary hearing, a room full of people with law degrees squared
off against one lone petitioner who was forced to record new
testimony for the public record devoid of any counsel. The lower
court then made an unreasonable determination of facts in light
of the evidence presented.

    After exhausting all state remedies, the petitioner finds
that this evidentiary hearing actually hampers his efforts to
obtain an evidentiary hearing in the Court where Errors of
Constitutional dimensions are properly heard. The only saving
grace lies in the fact that the facts support the petitioner's
claim and if ignored could change the scope of powers now posse-
ssed by officers acting under the color of law.

    The petitioner and his brother have at all times maintained
that they acted in self defense. Precedent for such action can be
found in the case of State v. Robinson, 36 A.2d 27(App.2).

    An Evidentiary hearing is requested by the petitioner
wherein these claims and all of the others can be properly
layed before this Honorable Court.

5

## CONCLUSION

In light of the aforementioned, petitioner requests an
evidentiary hearing be ordered so that the errors of
Constitutional Dimensions can be further
explored and redressed.

Robert W. Warrington,prose
SBI # 00442182
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE    19977

Dated: 7·26·06

H:    While Jesse was at your house and this altercation, where was your wallet?

W:    My wallet was in my back pocket.

H:    In your back pocket.

H:    Did he ever take your wallet out of your pocket during the altercation?

W:    Never.

H:    Never. So when we got your wallet at the scene, the check for $700 should be in your wallet.

W:    Yes. (sniff)

H:    No way, it could be in his wallet.

W:    Unless he had another check.

H:    Where's your wallet now?

W:    My wallet should be at the scene of the crime in my - back of the tan pants that was covered with his blood. (sniff, sniff)

H:    Do you have any idea why Jesse would write a check out to you to make you cash it, instead of just writing a check out to himself and going and cashing it? Or just writing it out to anybody and going and cashing it?

W:    Cause, he knows my Dad has a lot of money.

H:    I don't think you understand my question. If I stole a check from you I could write it out to anybody and go cash it, okay. I don't know that I would write out one of your Dad's checks to you and then go force you to go cash it for me if I had stolen the check.

W:    I'm the only person that's going to be able to get away with it.

H:    Okay.

W:    (sniff, sniff)

E:    Can we pause the interview for a minute?

H:    Yes.

H:    We'll pause the interview for a moment.

13

$A 1$

H:     It's about 10:42 p.m. (just hang on a second (can't understand rest) It's just my job to get to the truth that's all. Okay.

W:    (can't hear)

H:     Okay, we resume the tape. It's about 10:44 p.m.

H:     Have you or your father reported these checks being stolen?

W:    No – (can't understand rest of statement.

H:     Have you reported the house being broken into?

W:    No sir.

H:     Do you know when the house was broken into and these checks were taken?

W:    No sir. My Dad was assuming it was me.

H:     So there's been no – no sign of forced entry into the home or anything that you know of?

W:    The house is always unlocked.

H:     The house is always unlocked.

W:    Sniff, sniff, sniff, sniff.

H:     And when Jesse came over today he knocked on the door?

W:    Drew says he heard him knock. I didn't hear him knock - I just saw him walk in.

H:     You just saw him walk in.

H:     How do you know Drew heard him knock or. . . . .

W:    Because, outside when we were talking to the paramedics, he said he heard him.

H:     Okay.

E:     If Drew heard him knock and Drew was upstairs, did Drew come down and open the door, when he heard the door?

W:    No. Drew wasn't there when he walked in and heard Jesse talking and that's when he started to come downstairs.

14

A I

H:    Well, there's no lawyer here in the building. If you want a lawyer, I can provide you with a lawyer before I talk to you anymore. Am I – are you understanding what I'm saying?

W:    I understand what you're saying. I would rather talk to you than go back down to that cell right now.

H:    So how about if I tell you I won't put you back down in the cell. I'll put you somewhere else if you want a lawyer, okay.

W:    I didn't do anything wrong, so it's fine with me if we can just keep on going.

H:    I just want to make sure that you understand that. Don't say you don't want a lawyer just because you don't want to go down somewhere where you're uncomfortable, okay. If you want a lawyer, then you can have a lawyer. You know, don't base it on whether or not you're going somewhere and you want it to go faster. I just want to know, you know. You said you wanted to talk to me.

W:    I will gladly talk to you guys. I have nothing to hide.

H:    And you don't want a lawyer here with you right now?

W:    If a lawyer was here, it would just seem like I'm, I'm guilty. I'm certainly not guilty. So let's just keep on going answering the questions. I do not need a lawyer.

H:    All right. You don't want a lawyer?

W:    No.

H:    Okay. I just want to make sure that you understand that.

W:    (sniff, sniff, sniff)

E:    We've talked a lot, we've spent a lot of time talking about what actually happened tonight or today with your altercation with Jesse and all, but let's talk a little bit more about the, the checks. The only thing about the checks is, you know, at this point why hide anything with the checks? I mean if you stole the checks from your father in order to pay him off, it doesn't really make any sense at this point for you not to just tell us that.

W:    But, I didn't steal those checks. It was clearly out of the blue when I saw him – for him to hand me a check that was written out to me.

E:    I tell you the thing that I am having a problem with here is – you owe this guy money from three of four years ago.

27

A 1

W:    Do you think this is bad - - that I'm talking to you like this without my lawyer?

H:    That's your choice. Whether or not its good or not.

W:    I have nothing to hide whatsoever.

E:    Well – we need to uh take a break from the interview, because uh, the Trooper here at Troop 7 needs to utilize the Intoxilyzer Machine that sits right behind you. But before we leave this interview room, the comment that you just made, we need to make absolutely certain that you understand your rights and that you want to talk to us, okay? Before we go any further. All right.

H:    Okay, I had to turn the tape over to Side B. It stopped sometime during the interview on Side A. The time right now is about 11:05 p.m. On Side B, we are going to stop the tape to take a break. Another officer needs to use the room for a moment.

TAPE OFF

H:    Okay, we will resume the interview. It is about 11:18 p.m. Wes, do you still want to talk to – myself and Detective Evans?

W:    Yes sir.

H:    Okay. Do you want a lawyer to be here with you right now?

W:    Do I have a lawyer?

H:    Well, I read you the Miranda earlier, did you ask me that question?

W:    I'll try not to tie up the process here_____more time. I don't feel like sitting in that cold concrete cell in this sheet_____ I want someone to help me out sir.

H:    You have to make the decision as to whether or not you want a lawyer here or not. That's your choice.

W:    I have nothing to hide.

H:    You have nothing to hide.

H:    And that means that you don't want a lawyer here right now?

W:    Unless there's a lawyer in the building (can't understand)

26

A l

H:    He needed help?

W:    That's the point when he started _____ I looked at him and said, "shut the fuck up" and kicked him and he fell and was, "Why are trying to kill me? And I was – "Why did you try to kill me?"

H:    And, at that point he was dying?

W:    (crying) And, at that point he was definitely dying. I got up and I went and I checked on the phone and couldn't get the phone and there was nothing; then the phone rang and it was the state police again. I answered it, but I got so scared (can't understand).

H:    What was your reasoning in the beginning that _____ just you and your brother

W:    crying – (can't understand) what would happen if the cops got involved – this person come into my house and (can't understand) Everybody talks about that cell at Troop 7 and nobody I know is going to stop in there wrapped in a sheet like this. It is so cold – very little _____ sniff.

H:    Is everything you told me today, the truth?

W:    Yes sir.

H:    Is there anything you need to add or change from what you told me?

W:    (can't hear)

H:    Okay. We will stop the interview. It is approximately 11:34 p.m.


Key Codes:

        W = Robert W. (Wes) Warrington

        H = Detective Robert A. Hudson

        E = Detective John R. Evans

34

A1

as a statement made by the plaintiff subsequent to the bringing of the plaintiff contradicting the plaintiff's positive suit ... on the trial. Examination of the ... and ... discloses that the first count of the amended complaint differed in no material respect from the complaint under which the case was tried. It is true that the proposed amendment added a second count claiming criminal conversation in addition to alienation of affections, but this did not contain ... the attitude of the plaintiff was ... It is found that the donation of the defendant ... offense; and examination of the evidence in connection with the attack made upon the finding shows that the plaintiff offered the evidence upon the basis of which this admission was found to have been made.

[4,5] A witness for the defendant was asked whether or not prior to August, 1940, from her observation, Mrs. Armstrong strong, and any love whatsoever for Mr. Armstrong. She answered that Mrs. Armstrong had none. The finding discloses neither the extent of the observations nor the time when they were made ... It is true that the modern tendency is to liberalize the rules governing the admission of evidence of this character and we have approved this tendency in principle. (MacLin v. Bishop, 113 Conn. 312, 155 A. 210), but we have repeatedly said that the trial court has discretionary powers as to its admission; ... 155 A. 210; Spencer's Appeal, 77 Conn. 638, 643, 60 A. 289; ... Richmond ... wich, 96 Conn. 582, 595, 115 A. 11. From our very brief excerpt in the finding, we cannot say that the trial court abused its discretion in excluding the statement of the witness as to whether Mrs. Armstrong had any love "whatsoever" for Mr. Armstrong.

[6-8] The last objections are to testimony given as to the state of health of ...

... that there was no claim for special damages. It does not appear that this sum was included in the damages and this testimony may have been received by the court simply as indicating the seriousness of the plaintiff's physical condition ... v. New Idea Realty Co., 104 Conn. 508, 512, 133 A. 586.

[9-11] Only one other assignment of error requires notice. The trial court concluded that the plaintiff was entitled to punitive damages which in this case consist of the expense of litigation less taxable costs. McGann v. Allen, 105 Conn. 177, 185, 134 A. 810. No evidence of the expense of litigation was introduced. The better and sounder practice is to introduce such evidence. Crams v. Donovan, 95 Conn. 482, 484, 111 A. 796; but the defendant admits that this is generally unnecessary and that it ... here ... in view of the employment by the plaintiff of three attorneys at different times ... testimony was required. Whatever might be the situation in a trial to the jury, the claims of the defendant are ineffective to take this case out of the general rule where the trial is to the court ...

There is no error.

---

STATE v. ROBINSON.

Court of Oyer and Terminer of Delaware.

Feb. 14, 1944.

1. Homicide.

2. Criminal law.

3. Homicide.

4. Homicide.

5. Homicide.

6. Homicide.

7. Homicide.

LAYTON, C. J., and RICHARDS and TERRY, JJ., sitting.

Daniel J. Layton, Jr., Deputy Atty. Gen., for the State.

Houston, Wilson, of Georgetown, for defendant.

Charge to the jury.

Monroe Robinson was charged with manslaughter, and he pleaded self-defense.

... "In manslaughter prosecution, the burden of proof on issue of self-defense is on the defendant, but if on the whole state of evidence the prosecution does not sustain burden resting on it to establish guilt of defendant beyond a reasonable doubt, defendant should be acquitted."

... "In determining whether defendant charged with manslaughter had succeeded in so establishing assailant that defendant was no longer in danger of death or suffering great bodily harm, jury could consider suddenness of the attack, respective ages of parties, and that person suddenly and violently wounded thereby may not reasonably be supposed to retain the presence of mind, calmness and composure necessary to weigh with nicety the question whether such other means short of taking life would answer the purpose.

... "One of the prayers for instructions submitted on behalf of the defendant was ..."

**28**  Del.

30 ATLANTIC REPORTER, 2d SERIES

tends and endeavors by violence or by means of escape from, death or great bodily harm, ... perpetrates ... of this ... tacked by ... Under the circumstances of this case, therefore, if you should find from the evidence that Monroe Robinson, the defendant, was then and there assaulted by the deceased, Frank Jackson, with violence and surprise, with intent to commit murder on the person of the part ... Jackson, and your verdict should be 'Not Guilty.'

The prayer was refused.

LAYTON, Chief Justice, charged the jury in part as follows:

[1, 2] The defense in this case is that the defendant killed the deceased ... necessary defense of his own life. When ... this defense is absolute, the jury ... established to the satisfaction of the ... in ... to a verdict of acquittal. The burden of proof in such a defense is upon the defendant; but while he does bear the burden of proof, yet, if upon the whole state of the evidence, the prosecution has not sustained the guilt of the defendant beyond a reasonable doubt, the defendant should be acquitted.

[3] The right of self-defense rests upon necessity. In repelling or resisting an assault no more force may be used than is necessary for the purpose, and if the person attacked ... in his defense ... more force than is necessary, he, himself, becomes the aggressor.

Ordinarily one who is attacked ... even if the attack is of such character as to create in his mind a reasonable belief that he is in danger of death or great bodily harm, is under the duty to retreat, if he can safely do so, or within his power ... by other such other reasonable means as to avoid killing his assailant; for no one may take the life of another, even in the great bodily harm at the hands of the ... exercise of the right of self-defense, unless ...

... another is not excusable, taking ... or apparent necessity, taking ... the right of self-defense rests ... his own safety. But having in mind real ... the person attacked will become the aggressor ... fering further great bodily harm, it should be ...

... ceded in so disabling the deceased that the ... was no longer in danger of death or of suffering further great bodily harm ...

---

**STATE ex rel. DIXON v. MISSOURI-KANSAS PIPE LINE CO.**

Superior Court of Delaware, New Castle.

Nov. 15, 1943.

**1. Corporations ⟨⟩181(1)**

Basis of stockholders' right to inspect corporate books is right of ownership of corporate property held through medium of ownership of shares.

**2. Corporations ⟨⟩181**

Right of director to examine corporate books grows out of fact that a "director" is a representative of all stockholders and, in a sense, managing partner of corporation.

See Words and Phrases, Permanent Edition, for all other definitions of "Director".

**3. Corporations ⟨⟩181(1), 311**

A stockholder has a qualified right to examine corporate books while director's right so to do is absolute.

**4. Corporations ⟨⟩181(1)**

Board of directors has no right to require a stockholder to state reasons for examination of such books as a basis for examination which he may examine.

**5. Corporations ⟨⟩181(6)**

In mandamus by stockholder to compel corporation to permit examination of stock ledger, it is only necessary to allege ownership of shares, a request for examination, and a refusal of such request, since important if pushed is a matter of defense.

**6. Corporations ⟨⟩181(6)**

A stockholder is not required to allege his purpose in original request to corporation for permission to examine stock ledger, and thereby subject himself to examination and cross-examination by corporate officials.

**7. Corporations ⟨⟩181(7)**

A corporate director's request for examination of corporate records must be explicit, and ... low directors cannot require such reasons.

**8. Mandamus ⟨⟩14(3)**

Where director's request for examination of corporate records was explicit, answer disclosing that corporation would not grant examination until director appeared ...

... such examination of corporate books ...

**10. Corporations ⟨⟩181(1)**

A stockholder, having right to examine certain corporate books, may avail himself of assistance in such examination so as to make examination effective, and personal attendance of stockholder is not required during examination.

**11. Corporations ⟨⟩311**

A director may have the assistance of other persons in conducting an examination of corporate records.

**12. Corporations ⟨⟩181(1), 311**

The right of examination of corporate books existing in directors and stockholders carries with it means of making examination effective.

**13. Corporations ⟨⟩311**

A corporate director need not be personally present at an examination of corporate books by director's authorized representatives.

Mandamus by the State, on the relation of Abner Paxson Dixon, against Missouri-Kansas Pipe Line Company to compel defendant to allow relator, by its agents, to examine books of defendant. On defendant's motion to dismiss petition.

Motion denied.

RODNEY and SPEARMAN, JJ.

Edwin D. Steel, Jr., of Wilmington, for relator.

C. Stewart Lynch, of Wilmington, for defendant.

Superior Court, New Castle County, No. 148 November Term, 1943.

Motion to dismiss petition for mandamus.

This is a petition for a Writ of Mandamus on behalf of the Relator, a director of the defendant company, to compel the defendant company, to examine the books of the company ...

## Certificate of Service

I, Robert W. Warrington  ,hereby certify that I have served a true

And correct cop(ies) of the attached: Petitioner's Traverse

_____ upon the following

parties/person (s):

TO: Office of the Clerk
United States District Court
844 N. King St. , Lockbox 18
Wilmington , DE  19801 - 3570

TO: Elizabeth R. McFarlan
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington , DE  19801

TO:_____

TO:_____

BY PLACING SAME IN A SEALED ENVELOPE, and depositing same in the United
States Mail at the Delaware Correctional Center, Smyrna, DE 19977.

On this  26  day of  July  ,2006

Robert W. Warrington

I/M Robert W. Warrington
SB# 00442182 UNIT V
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



Legal Mail

Office of the Clerk
United States District Court
844 N. King St., Lockbox 18
Wilmington, DE
19801-3570

