# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ROBERT W. WARRINGTON,      )
                                  )
         Petitioner,       )
                                  )
       v.                 )     Civ. A. No. 06-67-GMS
                                  )
PERRY PHELPS, Warden,       )
and JOSEPH R. BIDEN, III, Attorney  )
General of the State of Delaware,   )
                                  )
        Respondents.[1]    )

---

Robert W. Warrington. *Pro se* petitioner.

Elizabeth R. McFarlan, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Attorney for respondents.

---

## MEMORANDUM OPINION

_March 31_, 2009
Wilmington, Delaware

---

[1]Attorney General Joseph R. Biden, III replaced former Attorney General Carl C. Danberg, an original party to this case, and Warden Perry Phelps replaced Warden Thomas Carroll, an original party to this case.  *See* Fed. R. Civ. P. 25(d)(1).

Sleet, Chief Judge

## I. INTRODUCTION

Petitioner Robert Wesley Warrington ("Wes") is an inmate at the Delaware Correctional

Center in Smyrna, Delaware. Wes filed the pending petition for a writ of habeas corpus

("petition") pursuant to 28 U.S.C. § 2254. (D.I. 1.) For the reasons that follow, the court will

dismiss his petition.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As detailed by the Delaware Supreme Court in Wes' direct appeal, the facts of his case

are as follows:

> Robert Wesley Warrington ("Wes"), then 22, and Andrew Warrington, ("Drew"), then
> 18, are brothers who lived with their father at 100 Port Lewes in Sussex County. Wes
> owed an acquaintance, Jesse Pecco ["Pecco"], approximately $800 for drugs that Wes
> had consumed instead of selling. In order to partially repay the debt, Wes forged a check
> from his father's bank account, making it out to himself in the amount of $700. Wes
> gave the check to Pecco on Friday, August 11, 2000, and the two men agreed to meet on
> Monday to cash the check.
>
> Pecco did not go to the meeting place. Instead, he drove to 100 Port Lewes, and parked
> his car directly behind Wes's car so as to immobilize it. Pecco then entered the dwelling
> through its unlocked front door. Drew, who was upstair watching television, heard shouts
> coming from the first floor. When he went downstairs to see what was happening, he
> found Pecco involved in a physical struggle with Wes. Drew soon realized that the two
> were fighting over control of a knife that Pecco was holding. Drew struck Pecco from
> behind, causing him to release the knife. According to Wes, Pecco then had the
> opportunity to leave the house, but instead chased Drew, who had fled up the stairs. Both
> brothers maintain that Pecco was the aggressor in the fight, and that they believed he
> posed a threat.
>
> The two brothers testified that they gained the upper hand as Wes stabbed Pecco
> repeatedly with the knife and Drew struck him repeatedly with a fireplace poker.
> Ultimately it was determined that Pecco sustained 13 stab wounds, including one that
> penetrated his left lung, and one that penetrated his heart. Expert testimony at trial
> revealed that he also suffered eight blunt-force blows to the head, causing a fractured
> skull and subdural hemorrhaging. Among Pecco's injuries were deep incise stabs to his

1

hands, characteristic of defensive wounds.

During the altercation, a 911 call was made from the Warrington residence. DNA from blood marks found on the telephone used to make the call matched Pecco's DNA. One of these marks was located next to the "one" button on the telephone, indicating that hit was Pecco who dialed the emergency number. Drew gave a conflicting account, saying that it was he who dialed the number, only to have Pecco knock the phone from his hands.[2] The jury listened to the sounds of the fight, as recorded on the 911 tape, before reaching its conclusion regarding self-defense. The tape revealed that, towards the end of the fight, Pecco was pleading with the brothers to stop attacking him. He asked, "Why are you guys trying to kill me?" To which one of the brothers responded, "good reasons." As he died, Pecco said, "Wes, show me some love. Give me a hug before I die. Give me a hug." Testimony demonstrated that Drew responded by kicking him in the face and telling him to shut up.

*Warrington v. State*, 840 A.2d 590, 591 (Del. 2003).

Wes and Drew were arrested and subsequently indicted on charges of first degree murder, two weapons offense, and first degree conspiracy. In November 2001, a Superior Court jury found both Warrington brothers guilty of first degree murder, possession of a deadly weapon during the commission of a felony, and first degree conspiracy. *Warrington v. State*, 2006 WL 196437, at 81 (Del. Jan. 24, 2006). Wes was sentenced to life imprisonment plus twenty-five years, and his convictions and sentences were affirmed on direct appeal. *Warrington v. State*, 892 A.2d 1085 (Table), 2006 WL 196433 (Del. 2003).

In March 2003, Wes filed a motion for post-conviction relief pursuant to Delaware Superior Court Rule 61 ("Rule 61 motion") raising twenty-five grounds for relief, including allegations of ineffective assistance of counsel. After holding two evidentiary hearings, and considering the defense attorneys' affidavits and the State's response, the Superior Court denied Wes' Rule 61 motion. *State v. Warrington*, ID No. 0008014970(R-1), Letter Op. (Del. Super. Ct.

---

[2]Wes contends that he dialed 911, and that the Delaware Supreme Court's summary of facts incorrectly states that Drew dialed 911. (D.I. 22, at pp. 1-2.)

2

Jan. 3, 2005).  Wes appealed, and the Delaware Supreme Court affirmed the Superior Court's

judgment.  *See Warrington,* 2006 WL 196433, at *1.

Wes timely filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, the

State filed an answer, and Wes filed a reply.  (D.I. 1; D.I. 17; D.I. 22.)  Wes' petition is ready for

review.

## III. GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

"to reduce delays in the execution of state and federal criminal sentences . . . and to further the

principles of comity, finality, and federalism."  *Woodford v. Garceau,* 538 U.S. 202, 206

(2003)(internal citations and quotation marks omitted).  Pursuant to AEDPA, a federal court may

consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas

petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are

given effect to the extent possible under law."  *Bell v. Cone,* 535 U.S. 685, 693 (2002); *see*

*Woodford,* 538 U.S. at 206.

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the

petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b);

*O'Sullivan v. Boerckel,* 526 U.S. 838, 842-44 (1999); *Picard v. Connor,* 404 U.S. 270, 275

(1971).  AEDPA states, in pertinent part:

3

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or
    (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding. *See Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997)(citations omitted); *Coverdale v. Snyder*, 2000 WL 1897290, at *2 (D. Del. Dec. 22, 2000).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts. *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir. 2000); *Wenger v. Frank,* 266 F.3d 218, 223 (3d Cir. 2001); *see Teague v. Lane,* 489 U.S. 288, 297-98 (1989). Nevertheless, such unexhausted claims are procedurally defaulted. *Lines,* 208 F.3d at 160. Similarly, if a state court refused to consider a petitioner's claims for failing to comply with an independent and adequate state procedural rule, the claims are deemed exhausted but procedurally defaulted. *Harris v. Reed,* 489 U.S. 255, 263 (1989); *Werts*, 228 F.3d at 192.

Federal courts may not consider the merits of procedurally defaulted claims unless the

4

petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman v. Thompson,* 501 U.S. 722, 750-51 (1991); *Caswell v. Ryan,* 953 F.2d 853, 861-62 (3d Cir. 1992). To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). A petitioner can demonstrate actual prejudice by showing "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir. 2001). A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency, *Bousley v. United States,* 523 U.S. 614, 623 (1998), and is established if no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Sweger v. Chesney,* 294 F.3d 506, 522-24 (3d Cir. 2002).

### C. Standard of Review Under AEDPA

If a federal court determines that a claim is not procedurally defaulted and the state court adjudicated the federal claim on the merits, the court can only grant habeas relief if the state

5

court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim is considered to have been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d)(1) if the state court "decision finally resolv[es] the parties claims, with *res judicata* effect, [and] is based on the substance of the claim advanced, rather than on a procedural, or other ground." *Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004)(internal citations omitted), *rev'd on other grounds by Rompilla v. Beard*, 545 U.S. 374 (2005).

When reviewing a § 2254 petition, a federal court must presume the state court's determinations of factual issues are correct, unless the petitioner presents clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions). This presumption of correctness applies to both explicit and implicit findings of fact. *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000).

## IV. DISCUSSION

Wes asserts the following five grounds for relief in his petition: (1) both trial and appellate counsel provided ineffective assistance (Wes had a new attorney appointed after trial, but prior to sentencing); (2) his conviction was obtained by use of a statement elicited in

6

violation of due process; (3) there was insufficient evidence presented at trial to support his first

degree murder conviction; (4) the jury was improperly instructed as to defense in one's own

home; and (5) he was improperly denied counsel during the Rule 61 evidentiary hearing.

The State contends that claim one does not warrant relief under § 2254(d)(1), claims two

and three are procedurally barred from federal habeas review, and claims four and five do not

present issues that are cognizable on federal habeas review.  The court will review the claims in

seriatim.

### A.  Claim one:  ineffective assistance of counsel

In claim one, Wes contends that trial counsel provided ineffective assistance by failing to:

(1) have Wes' statement to the police suppressed;  (2) examine the black sweatshirt carefully and

have the back of the sweatshirt tested for the presence of blood;  (3) object to the prosecutor's

description of the brothers as "cold blooded killers" during opening statements;  (4) object to an

"altered" tape-recorded 911 call; (5) object to the admission of photographs of Wes' tattoo; (6)

object to the fact that the prosecutor "coached" a prosecution witness; (7) object to the

prosecutor's improper closing remarks about the blood evidence on the telephone;  (8) cross-

examine Detective Hudson and disclose counsel's close relationship with Detective Hudson;  (9)

call prepared witnesses; and (10) file motions to sever the brothers' cases and change venue.  In

allegation eleven, Wes contends that counsel was ineffective for advising him to testify about his

prior felony but to omit any reference to smoking marijuana.  And finally, in allegation twelve,

Wes asserts that appellate counsel provided ineffective assistance because he just signed the brief

prepared by counsel representing his co-defendant brother.

Wes exhausted allegations one through nine, eleven, and twelve by presenting them to the

Delaware Supreme Court on post-conviction appeal,[3] and the Delaware Supreme Court affirmed the Superior Court's denial of the arguments. Therefore, Wes will only be entitled to relief for these allegations if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688. In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-260 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

Here, the Delaware Supreme Court identified *Strickland* as the proper standard and analyzed Wes' allegations regarding counsel's performance within its framework. Therefore, the

---

[3]As explained later in the text of the opinion, Wes did not exhaust state remedies for allegation ten, which asserts that counsel performed ineffectively by failing to file motions to sever and for a change in venue. *See infra* at p. 25.

state supreme court's decision is not contrary to *Strickland*. *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause"). The court will separately review the adjudicated ineffective assistance of counsel allegations to determine whether the Delaware Supreme Court reasonably applied *Strickland* in denying those allegations.

>    1. <u>Trial counsel should have sought to have Wes' police statement suppressed as involuntary</u>

The record reveals that trial counsel moved to have Wes' police statement suppressed on the basis that the police illegally continued to interview Wes even after he requested counsel. The trial court denied the suppression motion, finding that the follow-up questions posed by the police indicated that Wes wanted the interview to proceed without counsel.

As he did in his Rule 61 motion, Wes now contends that trial counsel also should have sought to have the statement suppressed as involuntary because he was under the influence of marijuana when he provided the statement, and because the police purposely stripped him of his clothes and placed him in a cold basement in order to "break him" prior to questioning. However, based on the record, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in denying both allegations. First, during the Rule 61 evidentiary hearing, trial counsel testified that Wes specifically informed counsel that he did not smoke marijuana, and the police detective who interviewed Wes testified that Wes did not appear to be under the influence of marijuana during the relevant time. The Superior Court found defense counsel's recollection

9

to be more credible than Wes' recollection, and the court defers to that conclusion.[4]   Therefore,

Wes' argument that counsel provided ineffective assistance by failing to object to the

voluntariness of his statement due to his alleged marijuana use does not warrant habeas relief.

The court will provide a brief summary of the facts leading to Wes' next allegation that

counsel should have questioned the voluntariness of the statement based on the cold conditions

of the holding cell.  The record reveals that the police transported Wes from the murder scene to

Beebe Medical Center for medical treatment.  Once at the hospital, Wes removed his clothing

and was given a hospital gown to wear during the medical examination.  After Wes received

treatment, the police transported Wes to the Delaware State Police station.  Wes was still wearing

the hospital gown during that transport, and he continued to wear the gown during the videotaped

police questioning.  (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at

B-177.)  At various times throughout the statement, Wes complained about being cold.

Counsel explained how he viewed the videotape of Wes' police statement while

preparing for trial.  According to counsel's recollection, the videotape showed Wes in the

hospital gown, and also showed Wes complaining about being cold as well not wanting to go

back down into the lock up area.  However, counsel explained that, "based on the interaction as a

---

[4]The finder of fact in a defendant's trial determines the credibility of the witnesses or
resolves direct conflict in testimony. *See Jackson v. Virginia*, 443 U.S. 307, 326 (1979); *Tillery
v. Cavell*, 294 F.2d 12, 22 (3d Cir. 1961).  In turn, on habeas review, such credibility
determinations are accorded deference absent exceptional circumstances. *See Hernandez v. New
York*, 500 U.S. 352, 369 (1991); *Marshall v. Longberger*, 459 U.S. 422, 434 (1983)("federal
habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been
observed by the state trial court.").  In this proceeding, Wes has not asserted any exceptional
circumstances to justify the court's departure from the presumption of deference owed to the
Superior Court's conclusion that counsel's version of events was more credible than Wes'
version.

whole," he "didn't believe the fact that [Wes] said he was cold . . . was meritorious because I don't think it was a coercive environment in this situation." *Id.* at B-174.

Detective Hudson also testified during the evidentiary hearing that he informed Wes the police could provide him with other blankets or anything else West needed to get warm after Wes told Hudson that he was cold. (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-178.) Detective Hudson also informed Wes of his *Miranda* rights repeatedly throughout the statement. Wes verified this fact himself during the evidentiary hearing, informing the Superior Court judge that the police read him his *Miranda* rights "multiple times" during the videotaped statement. *Id.* at B-182.

In its written decision denying Wes' argument that counsel performed ineffectively by failing to raise the issue of the coerced statement, the Superior Court determined that any issue of Wes being cold was resolved at the time of the statement and did not constitute a voluntariness issue. The state court reviewed the "coercion by cold" issue pursuant to the test of voluntariness articulated in *Rogers v. Richmond*, 365 U.S. 534 (1961),[5] namely, that the issue is whether the "behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self determined - a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." *Id.* at 543-44. Applying this standard, the Superior Court noted that the videotape "evidences the detectives' concern about [Wes'] comments about being cold, as well as clearing up any ambivalence expressed by [Wes] as to whether [he] wanted to talk with the detective." *State v. Warrington*, ID No.

_____

[5]More specifically, the Superior Court reviewed the voluntariness issue pursuant to *State v. Rooks*, 401 A.2d 943 (Del. 1979), which, in turn, quoted the test for voluntariness articulated in *Rogers*.

0008014970(R-1), Letter Op. at p. 5 (Del. Super. Ct. Jan. 3, 2005).  The Superior Court

explained that, "considering the evidence of the videotape and the demeanor of both the detective

and [Wes]," any allegation of involuntariness would not have succeeded in getting the evidence

suppressed. *Warrington*, Letter Op. at pp. 5-6.  As a result, the Superior Court concluded that

counsel did not perform deficiently by not seeking suppression on the baseless ground that the

circumstances surrounding the statement were coercive, specifically stating that

> [b]ased upon [Rogers'] standard and a review of the tape of the statement, [Wes] has not
> established any deficient performance as to his allegation that his attorney should have
> also attempted to suppress his statement on voluntariness grounds.  Could the attorney
> have raised this?  Yes, but when considering the evidence of the videotape and the
> demeanor of both the detective and [Wes], I do not find counsel deficient for not seeking
> suppression as to voluntariness.  Trial counsel considered the "right to counsel" argument
> as his best shot at suppressing the statement.  When such judgments are made, the Courts
> shall be reluctant to second guess counsel's tactics."

*Id.* at p. 6.  The Delaware Supreme Court affirmed the Superior Court's decision.

To the extent the Superior Court's conclusion was based on its analysis of Wes' and

Hudson's demeanor during the videotaped statement as well as their demeanor at the evidentiary

hearing, it constitutes a credibility determination that is owed deference in this proceeding absent

extraordinary circumstances.  Perhaps in an effort to establish such extraordinary circumstances,

Wes has filed excerpts from the transcript of his police statement. (D.I. 22, at A1.)  One excerpt

reveals the following exchange between Hudson ("H) and Wes ("W"):

> H: Well, there's no lawyer here in the building.  If you want a lawyer, I can provide you
> with a lawyer before I talk to you anymore.  Am I – are you understanding what I am
> saying?
>
> W: I understand what you're saying.  I would rather talk to you than go back down to that
> cell right now.
>
> H: So how about if I tell you I won't put you back down in the cell.  I'll put you

12

somewhere else if you want a lawyer, okay.

W: I didn't do anything wrong, so it's fine with me if we can just keep on going.

H: I just want to make sure that you understand that. Don't say you don't want a lawyer just because you don't want to go down somewhere where you're uncomfortable, okay. If you want a lawyer, then you can have a lawyer. You know, don't base it on whether or not you're going somewhere and you want it to go faster. . . .

W: I will gladly talk to you guys. I have nothing to hide.

H: And you don't want a lawyer here with you right now?

W: If a lawyer was here, it would just seem like I'm, I'm guilty. I'm certainly not guilty. So let's just keep on going answering the questions. I do not need a lawyer.

H: All right. You don't want a lawyer?

W: No.

H: Okay. I just wanted to make sure that you understand that.

(D.I. 22, A1 at p. 27.)   Another excerpt reveals the following colloquy:

W: (crying) And, at that point he was definitely dying. I got up and I went and I checked on the phone and couldn't get the phone and there was nothing; then the phone rang and it was the state police again. I answered it, but I got so scared (can't understand).

H: What was your reasoning in the beginning that _____ just you and your brother

W: crying – (can't understand) what would happen if the cops got involved – this person come into my house and (can't understand). Everybody talks about that cell at Troop 7 and nobody I know is going to stop in there wrapped in a sheet like this. It is so cold – very little _____ sniff.

H: Is everything you told me today the truth?

W: Yes sir.

H: Is there anything you need to add or change from what you told me?

W: (can't hear)

13

H: Okay. We will stop the interview. It is approximately 11:34 p.m.

*Id.* at p. 34.

Although Wes provided these excerpts to support his allegation of coercion, the court actually concludes that the two exchanges support the Superior Court's finding that the tape of the statement demonstrates how Detective Hudson considered Wes' concerns and "was cognizant that the complaint be addressed independent of [Wes'] decision on whether he wished to talk with the detective." *Warrington*, Letter Op. at p. 4. Therefore, Wes has failed to demonstrate exceptional circumstances sufficient to justify the court's departure from the presumption of deference owed to the Superior Court's conclusion that the police did not use the cold conditions of the holding cell to coerce Wes' police statement.

In turn, the court concludes that the Delaware courts did not unreasonably *Strickland* in determining that counsel did not perform ineffectively by failing to raise the meritless coercion by cold argument. Accordingly, the instant allegation does not warrant relief under § 2254(d)(1).

### 2. Trial counsel failed to test the black sweatshirt for the presence of blood

After the Warrington brothers were arrested, the police collected several articles of clothing they were wearing as evidence, including a black sweatshirt and a blue sweatshirt. During the trial, counsel for Wes and counsel for Drew both contended that the police had mislabeled the black sweatshirt as belonging to Drew when, in fact, it was Wes' sweatshirt. (D.I. 20 in *Warrington v. Phelps*, Civ. A. No. 06-66-GMS, App. to State's Ans. Br. in *Warrington v. State*, No.34,2005, at B-29 to B-45.) However, the trial court overruled the objection and admitted both sweatshirts as evidence on the basis of the testimony given by the officer who collected the clothing. *Id.*

14

In his Rule 61 motion, Wes argued that his counsel provided ineffective assistance by failing to object to the admission of the black sweatshirt on the basis of this alleged mix-up. During the Rule 61 hearing, defense counsel testified that he only learned about Wes' theory about the sweatshirt "mix-up" after the trial had already started. Nevertheless, counsel explained how he and counsel for Drew thoroughly cross-examined the police officer who had collected the evidence specifically about the identification of the sweatshirts. In counsel's opinion, the cross-examination established "the point that the sweatshirts had been switched." (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-184.)

The Superior Court ultimately denied Wes' allegation regarding counsel's failure to object to the admission of the black sweatshirt for lack of prejudice. The state court explained that the time at which counsel learned of the alleged sweatshirt mix-up was not as important as the fact that, once trial counsel became aware of the issue, counsel thoroughly explored the alleged mix-up. *Warrington*, Letter Op. at p. 6. The Superior Court also opined that the issue of the mix-up was a "fact issue that was raised at trial and necessarily resolved by the jury. *Id.*

In this proceeding, Wes does not argue that his defense counsel failed to object to the admission of the two sweatshirts. Rather, he complains that counsel performed ineffectively by failing to have the back of the black sweatshirt tested for blood. According to Wes, the existence of those stains would have supported his version of the events that he took refuge in a bedroom and attempted to barricade the door by pushing against it with his back as Pecco pushed at the front of the door; Wes contends that the side of the door facing into the bedroom was covered in the same blood that covered the back of his sweatshirt. Wes also contends that the presence of blood on the back of sweatshirt would have demonstrated that he made the 911 call, not Pecco.

15

During the Rule 61 hearing, counsel testified that there was no reason to believe that any blood on the back of the sweatshirt was from anyone other than Pecco, because Wes did not suffer any injuries on his back that had been bleeding; rather, he had a couple of cuts on his hand, some scrape marks and bruise marks, and rug burns on both the front and back of his torso. (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-191.) Counsel also stated that,

> Your Honor, if you recall the sequence of events that were testified to by the Warringtons, [Wes] went into the bedroom prior to many of the wounds being inflicted. According to his testimony, he got flung down the stairs where he was injured. He testified he jumped on Mr. Pecco as Mr. Pecco had a hold of Drew's leg on the stairs and that he got flung down the stairs. That is when he busted into the door, kicked the door open, and braced the door with his back. There wouldn't be any blood at that point on his back because then he said there was more struggle within the bedroom after that. So at that point he says his back was against the [door], there would not have been any blood on the back of his sweatshirt based on the sequence of events that were testified to. So I don't believe and I still don't believe that that would have made an impact. Any blood that would have been on the back of his sweatshirt would have been after that.

*Id.* at B-187. Therefore, according to counsel, testing the blood stains would not have served any purpose because the stains would not have proven that Wes transferred blood from the sweatshirt to the door in a way that supported Wes' version of events.

In denying the claim that counsel was ineffective for failing to have the sweatshirt tested for blood, the Superior Court specifically held that

> the timeline of events establishes that [Wes'] version of events is not credible. The evidence strongly supports the victim seeking refuge in the bedroom, trying to make a 911 call as the door was forcibly broken down by the [Warrington brothers]. It supports [Wes] not having any knowledge of the 911 call until the 911 operator called back.[6]

_____

[6]The Superior Court judge had already noted that Wes' "claim that he made the 911 call is not at all credible. If he made the 911 call, then the deceit, shock and consternation shown by him upon getting the return call form the 911 operator is unexplainable. Immediately following Pecco's death, [Wes] hung the phone up or broke the 911 connection. The 911 operator

> Finally, [Wes] doesn't offer any theory as to how testing the shirt for blood would support his theory that he was the one who sought refuge in the bedroom. It's conclusory. To have had an expert testify there was blood on [Wes'] clothing would not have been surprising and would not have put the verdict in question. Thus, [Wes] fails to establish prejudice.

*Warrington*, Letter Op., at p. 8.

In this proceeding, Wes conclusively alleges that "trial counsel failed to examine crucial evidence, causing a failure to have the sweatshirt tested for blood on the back, which would have corroborated the petitioner's claim of making the 911 call." (D.I. 6, at p. 11.) However, given Wes' failure to provide evidence to the contrary, the court must accept the Superior Court's factual finding that Wes' version of events was not credible. The court also notes that Wes has failed to explain how the presence of blood on the back of the sweatshirt demonstrates that he made the 911 call rather than someone else. Accordingly, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in denying the instant claim for lack of prejudice.

### 3. Trial counsel did not object to the prosecutor's use of the term "cold blooded killers" in the opening statement

Wes also contends that trial counsel should have objected to the prosecutor's use of the term "cold blooded killers" during the opening statement. The Superior Court rejected this argument after noting that the prosecutor used the phrase in the context of describing what the 911 tape would reveal – a helpless victim begging for his life, only to be subjected to further violence. *Warrington*, Letter Op. at p. 11. In addition, the Superior Court found that Wes failed to demonstrate any prejudice caused by the comment because the trial court instructed the jury

---

immediately called back. When asked what was happening, [Wes] reported his brother was kidding around. He didn't report a home invasion and the death of the intruder. If he had made the call, why should he have been so deceptive? When [Wes] then realized the 911 operator had heard what had taken place, his panic is obvious." *Warrington*, Letter Op. at pp. 6-7.

that any opinion offered by a lawyer was not evidence and should not be considered.

The purpose of an opening statement is to preview the evidence and make the trial easier for the jury to follow. *See United States v. Dinitz*, 424 U.S. 600, 612 (1976). As explained by the Superior Court during Wes' Rule 61 proceeding, the term "cold-blooded" means lack of feeling or emotion,[7] and the evidence admitted at trial demonstrated that Pecco was murdered while pleading for mercy. Consequently, when viewed in context, the reference to Wes and his brother as "cold blooded killers" was not improper because the term merely emphasized the intentional, unprovoked, and unjustified nature of the attack on Pecco, which the prosecutor intended in good faith to prove at trial. (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-162.)

Moreover, Wes cannot demonstrate that he was prejudiced by the use of the term because the trial court instructed the jury that an attorney's opinion should not be considered as evidence. Accordingly, the court concludes that this claim does not warrant relief.

### 4. Trial counsel failed to object to the admission of the "altered" 911 tape

Wes contends that counsel should have objected to the admission of the 911 tape because it had been altered. During the post-conviction evidentiary hearing, counsel testified that he had the tape digitally enhanced in order to improve quality of the sound. The content of the tape was then transcribed to written form. Counsel, the prosecutor, and the investigator subsequently spent hours together comparing the tape to the transcript in order to determine which language could be understood and which language could not be understood. The language that could not be clearly deciphered was marked on the transcript as inaudible. (D.I. 18, pt.2, App. to State's

---

[7]*Warrington*, Letter Op. at p. 11.

18

Ans. Br. in *Warrington v. State*, No.41,2005, at B-200.)

In his Rule 61 motion, Wes contended that trial counsel performed ineffectively by not having the 911 tape transcribed by an independent expert. The Superior Court denied the claim as conclusory, noting that Wes did not establish that the digital enhancement, and subsequent transcription, was somehow inaccurate. *Warrington*, Letter Op. at p.10. The Superior Court also noted that Drew's attorney initially moved to suppress the 911 tape and transcript because the tape had been "tampered" with, but how, after further investigation, Drew's counsel withdrew the suppression motion because he determined that there was no basis to allege tampering. *Id.*

As an initial matter, the court notes that the authenticity of the 911 tape is a matter of Delaware state evidentiary law. On federal habeas review, evidentiary rulings by state courts are presumed to be correct unless the relevant state court determination is not fairly supported by the record. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981). In this case, the record reveals that the "alteration" of the 911 tape forming the basis of Wes' challenge was performed at his own counsel's request, and only consisted of digital enhancement to improve the quality of the sound. The record also reveals that Drew's attorney abandoned any idea of suppressing the admission of the 911 tape on this basis after performing his own independent investigation and determining that the tape had not been improperly altered. Therefore, the court accepts as correct the Superior Court's evidentiary ruling that the 911 tape was properly admitted at trial because the record fairly supports that ruling.

Given the admissibility of the 911 tape and transcript, and the absence of any reason to doubt their authenticity, the court concludes that counsel did not perform ineffectively by failing to object to the admission of the 911 tape on authenticity grounds. Accordingly, the Delaware

19

Supreme Court reasonably applied *Strickland* in denying this allegation.

### 5. Trial counsel failed to object to photographs of Wes' tattoo

According to Wes, counsel provided ineffective assistance by failing to object to the

photographs of Wes' dragonhead tattoo. *Warrington*, Letter Op. at p. 13. The Superior Court

denied this claim because nothing in the record indicated that the jury was actually shown such

photographs, and even if true, there was nothing inherently prejudicial in a dragonhead tattoo. In

fact, during the Rule 61 hearing, Wes actually admitted that it may have been his brother Drew's

dragon tattoo that he remembered being shown to the jury. (D.I. 18, pt.2, App. to State's Ans.

Br. in *Warrington v. State*, No.41,2005, at B-232.)

Wes has presented nothing new in this proceeding to demonstrate that pictures of his

dragon tattoo were actually shown to the jury. In turn, even if such pictures were shown to the

jury, Wes has failed to demonstrate that the result of his trial would have been different but for

counsel's failure to object to admission of the pictures of his tattoo. Accordingly, this allegation

does not warrant relief under *Strickland.*

### 6. Trial counsel did not object to prosecutor's coaching of a witness

Wes asserts that the prosecutor coached a witness regarding the issue of who was wearing

the black sweatshirt on the night of the murder. The Superior Court denied the claim as

conclusory, and the Delaware Supreme Court affirmed that judgment. Nothing in the record

supports Wes' allegation that the prosecution coached a witness. Therefore, the court concludes

that the Delaware Supreme Court's did not unreasonably apply *Strickland* in denying this claim

as conclusory.

### 7. Trial counsel failed to object to the prosecutor's improper closing remarks about the blood evidence on the telephone

During the trial, a forensic DNA expert testified that he examined three stains on the telephone used to make the 911 call – one stain located in the area between the "one" and "four" buttons, another stain located on top of the phone, and a third stain located on the base of the phone. (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-48 to B-51.) In his closing argument, the prosecutor referred to a fingerprint found "right in that general area, right by the one on the phone." *Id.* at B-128. Wes contends that the prosecutor incorrectly stated that the fingerprint smudge was found above the one "when, in fact, it was above the three." (D.I. 6, at p. 12.) Therefore, Wes argues that trial counsel performed ineffectively by failing to object to the prosecutor's description as improper. *Id.*

Wes presented this same argument in his Rule 61 motion, and the Superior Court concluded that counsel's "failure" to object to the prosecutor's statement did not constitute ineffective performance because the prosecutor did not mis-characterize the evidence and his statement did not mislead the jury. *Warrington*, Letter Op. at p. 16. The following excerpt involving the prosecutor's examination of the expert demonstrates the reasonableness of the Superior Court's conclusion.

> Q: With regard to the item Q11-1B, could you point out, so that the jury can see and then also turn to the other side of the courtroom, where you took Q11-1B?
>
> A: Q11-1B was taken from this area that has the letters G, H, I in between the one and four (indicating).
>
> Q: Is that sample close to the one button on the phone?
>
> A: Yes, it is.

21

(D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-49.) It is clear that the prosecutor did not mis-characterize the expert's testimony that the that the fingerprint found between the one and four buttons was close to the one button by stating that the smudged fingerprint was located in the "general area" of the one button. Accordingly, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in holding that Wes was not prejudiced by counsel's failure to raise a meritless objection to the closing argument.

### 8. Trial counsel failed to disclose his close relationship with Detective Hudson and he failed to cross-examine Detective Hudson

Wes contends that trial counsel performed ineffectively because he failed to disclose his close relationship with Detective Hudson. Wes presented this allegation to the Superior Court in his Rule 61 motion. During the Rule 61 evidentiary hearing, both defense counsel and Detective Hudson testified that they knew each other in high school, approximately twenty years before the date of Wes' trial, but that they had not socialized since graduating from high school. The Superior Court explicitly found that Wes did not show that trial counsel and Detective Hudson were friends or that any friendship between the two caused Wes prejudice. *Warrington*, Letter Op., at pp. 10-11. Therefore, the Superior Court denied Wes' allegation that counsel provided ineffective assistance as a result of his relationship with Detective Hudson.

The transcript of the Rule 61 evidentiary hearing belies Wes' assertion that defense counsel and Detective Hudson were "best friends." Accordingly, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in affirming the Superior Court's decision.

Wes also contends that counsel did not cross-examine Detective Hudson. However, in

his Rule 61 motion, Wes did not allege that counsel failed to cross-examine Detective Hudson; rather, he alleged that counsel failed to cross-examine Detective Hudson about "the circumstances of the statement, or why the Defendant's were released, or anything relevant due to being friends with the detective." *Warrington*, Letter Op. at p.14. The Superior Court denied Wes' allegation, explicitly holding that Wes failed to satisfy either *Strickland* prong because he did not offer anything regarding "what would have been obtained had cross-examination been conducted in a different fashion." *Id*

Given Wes' *pro se* status, the court liberally construes Wes' instant allegation to be the same as the one raised in his Rule 61 motion. Nevertheless, the allegation fails to warrant habeas relief. As he did in his Rule 61 proceeding, Wes has failed to describe the information he believes defense counsel would have elicited by conducting his cross-examination in a different manner. Thus, because Wes has not demonstrated prejudice, the court concludes the Delaware Supreme Court reasonably applied *Strickland* in affirming the Superior Court's denial of this claim.

### 9. Trial counsel failed to call prepared witnesses

Wes alleges that counsel provided ineffective assistance because he failed to call prepared witnesses. Even if the court presumes that this allegation is the same one raised in Wes' Rule 61 motion, namely, that trial counsel failed to call witnesses who were prepared to testify about the victim's reputation for violence, the court concludes that the allegation does not warrant relief. During the Rule 61 hearing, defense counsel explained that he interviewed the witnesses suggested by Wes, but he elected not to call some of those witnesses because they would have testified that the victim was "all bark and no bite"; counsel believed that such a characterization

would have detracted from the defense theory that Wes had a real reason to fear the victim. (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-217 to B-220, B-242 to B-249.) The Superior Court denied Wes' complaint for failing to satisfy either prong of *Strickland*, explicitly noting that Wes did not make any specific proffer of testimony from the prospective witnesses to support his claim.

Once again, Wes has not provided any support in this proceeding for his conclusory allegation regarding counsel's "failure" to call prepared witnesses. Thus, the court concludes that the Delaware Supreme Court's decision constitutes a reasonable application of *Strickland*.

### 10. Trial counsel failed to file motions to sever and for a change venue

The court notes that Wes did not present the issues contained in allegation ten to the Delaware Supreme Court on post-conviction appeal. As a result, these allegations are unexhausted and procedurally defaulted. Wes has not alleged any reason for his failure to raise these allegations on post-conviction appeal, and therefore, the court will not address the issue of prejudice. Accordingly, the court will deny allegation ten as procedurally barred.[8]

### 11. Trial counsel provided ineffective assistance by advising Wes to testify about his prior felony but to omit any reference to smoking marijuana

Wes alleges that counsel provided ineffective assistance by advising him to not mention the fact that he smoked marijuana prior to the murder. Wes presented this claim in his Rule 61 motion. During the Rule 61 evidentiary hearing, defense counsel testified that he asked Wes if

---

[8]The court further notes that that Drew's counsel filed motions to sever and for a change in venue, which were denied by the trial court. *See* Del. Super. Ct. Crim. Dkt. Items 20 & 22 in D.I. 20 of *Warrington v. State*, 06-66-GMS. Wes has not provided any reason why his counsel had a better chance of success with such motions than did his co-defendant's counsel. Therefore, the court alternatively concludes that the allegations lack merit.

24

he had consumed drugs prior to the homicide, and Wes responded that he had not. Based on the testimony provided during the Rule 61 proceeding, the Superior Court concluded that Wes had failed to establish that counsel directed him to lie by omission, and therefore, denied Wes' allegation that counsel provided ineffective assistance in this respect.

In this proceeding, Wes does not provide any support for the allegation that counsel advised him to lie by omission. Accordingly, the court will not grant habeas relief for this allegation.

Wes also contends that trial counsel performed ineffectively by advising him to tell the jury about his prior conviction for conviction for possession of marijuana. During the Rule 61 hearing in the Superior Court, counsel explained that he wanted Wes to appear honest and forthcoming. Counsel also wanted to set the stage in order to demonstrate why Wes owed Pecco drug money and why Wes feared Pecco. (D.I. 18, pt.2, App. to State's Ans. Br. in *Warrington v. State*, No.41,2005, at B-214.); *Warrington*, Letter Op. at p. 14. The Superior Court held that defense counsel did not perform ineffectively in this respect, explicitly finding that

> [i]n these circumstances, I cannot fault defense counsel for trying to "take the wind out of the sails" of the prosecution. Defense counsel wanted the jury to form the opinion his client was being honest and he didn't want the appearance that he was holding anything back. In view of this, I do not find trial counsel's advice to his client to include the Florida arrest to be ineffective assistance of counsel. Nor do I find any prejudice. To provide the jury with the background of why this case occurred and why he was not guilty he testified fully as to using and selling drugs. Therefore, as a trial strategy, it was necessary for the Defendant to acknowledge prior criminal conduct. The Florida arrest pales when compared to the drug activity occurring in Delaware. This testimony was necessary to establish why the Defendant owed the victim money and why he feared the victim.

*Warrington*, Letter Op. at p.13. Viewing counsel's advice in context with the circumstances surrounding Wes' case, the court concludes that the Delaware Supreme Court reasonably applied

*Strickland* in affirming the Superior Court's decision.

### 12. Appellate counsel provided ineffective assistance because he just signed the brief prepared by counsel representing his co-defendant brother

The only issue raised in Wes' consolidated direct appeal concerned the trial court's jury instruction on self-defense. On post-conviction appeal, Wes raised a total of six arguments challenging his conviction. One of those claims alleged numerous complaints about trial counsel's performance, but only one complaint about appellate counsel. Specifically, Wes argued that appellate counsel had been ineffective on direct appeal because "[t]he appeal consisted of [counsel's] signature on the appeal developed by the co-defendant's counsel, which contained the false contention that the defendants believed that they had a right to kill. In fact, the defendants intended to defend themselves. They never had any intent to kill." (D.I. 18 pt. 2, Appellant's Op. Br. in *Warrington v. State*, No. 41, 2005, at p. 44.) Wes also argued that the trial court provided faulty jury instructions on self-defense, and that there was insufficient evidence to support his convictions. *Id.* at p. 43. The Delaware Supreme Court rejected all of the claims Wes raised on post-conviction appeal and affirmed the Superior Court's denial of his Rule 61 motion.

In this proceeding, Wes contends that "appellate counsel failed to do anything but sign his name to the brief prepared by co-defendant's counsel." (D.I. 6, at p.12.) Reading this claim in conjunction with the related claim Wes raised on post-conviction appeal, the court liberally construes Wes' present argument to be that appellate counsel was ineffective for failing to argue that Wes did not intend to kill Pecco, but only acted in self-defense.[9] In turn, viewing this

---

[9]The issue as to whether Wes and Drew intended to kill Pecco or merely defend themselves was a question of fact for the jury to decide, and they apparently decided that the

26

construed claim in conjunction with claim three of this proceeding, it appears that Wes is also arguing that appellate counsel performed ineffectively by failing to challenge the sufficiency of the evidence supporting his first degree murder conviction.

The text of the Delaware Supreme Court's decision indicates that the state supreme court reviewed these particular allegations regarding appellate counsel's performance claim in determining whether Wes' demonstrated cause sufficient to avoid his procedural default of his insufficiency of the evidence and faulty jury instruction claims under Rule 61(i)(3).[10] The state supreme court concluded that Wes had not established cause. Therefore, the court must determine whether the Delaware Supreme Court's rejection of the ineffective assistance of appellate counsel claim warrants relief under § 2254(d)(1).

In order to establish ineffective assistance of counsel due to counsel's failure to raise certain issues on appeal, Wes must show that the outcome of the appeal would have been different but for counsel's failure to raise those issues. *See Sistrunk v. Vaughn*, 96 F.3d 666, 670

---

brothers did not act in self-defense.

[10]As previously noted, Wes raised numerous allegations regarding trial counsel's ineffectiveness, but only one allegation about appellate counsel's performance. In its decision, the Delaware Supreme Court states "Wes' second claim is that his trial counsel provided ineffective assistance," and then proceeds to affirm the Superior Court's denial of those allegations. *Warrington*, 2006 WL 196433, at *1. Based on the state supreme court's explicit reference to "trial counsel," the court concludes that the state supreme court did not consider the allegation regarding appellate counsel's performance when it considered Wes' complaints about trial counsel's performance. Rather, considering the fact that Delaware prisoners routinely allege ineffective assistance of counsel when they attempt to establish cause for a procedural default of an issue in state court, *see, e.g., Younger v. State*, 580 A.2d 552, 556 (Del. 1990), the court views the Delaware Supreme Court's statement that Wes did not provide any evidence to overcome the procedural bars of Rule 61(i)(3) and (4) with respect to the faulty jury instruction, or the procedural bar of Rule 61(i)(3) with respect to the insufficient evidence claim, as the state supreme court's consideration, and rejection, of Wes' argument that appellate counsel provided ineffective assistance.

(3d Cir. 1996). When determining if counsel performed ineffectively, a reviewing court must keep in mind that an appellate attorney is only obligated to present the issues he or she deems most likely to succeed on appeal, rather than every non-frivolous claim suggested by his client, and that such choices are owed deference under *Strickland*. Moreover, methods of case presentation are within counsel's professional judgment, to which this court must also give great deference under *Strickland*. *Strickland*, 466 U.S. at 688-89; *See Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996).

In determining that Wes had failed to demonstrate prejudice sufficient to overcome his procedural default of the insufficient evidence claim under Rule 61(i)(3), the Delaware Supreme Court reviewed the claim under the standards of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Delaware Supreme Court ultimately concluded that "there was ample evidence presented at trial to support Wes' convictions of murder in the first degree, possession of a deadly weapon during the commission of a felony, and conspiracy in the first degree." *Warrington*, 2006 WL 196433, at *2. In denying Wes' claim regarding the allegedly faulty jury instruction as procedurally barred, the Delaware Supreme Court concluded that "the Superior Court properly instructed the jury on self-defense as well as the State's burden of proof beyond a reasonable doubt, and there was there no prejudice to [Wes]." *Id.* Viewing both of these conclusions together, the court concludes that Wes has failed to demonstrate that the outcome of the appeal would have been different but for counsel's failure to raise the issue regarding Wes' alleged lack of intent to kill Pecco. Therefore, the court concludes that Wes' claim regarding appellate counsel's performance fails to warrant habeas relief.

28

**B. Claims two and three: procedurally barred**

In claim two, Wes contends that he was under the influence of marijuana and held naked and freezing in a basement before giving his statement to the police, and that he was promised clothes if he would provide a statement. Therefore, Wes asserts that his statement was not voluntary. In claim three, Wes contends that there was insufficient evidence to support his conviction for first degree murder because there was no evidence that he intended to kill Pecco.

Wes exhausted state remedies for both claims by presenting them to the Delaware Supreme Court on post-conviction appeal. The Delaware Supreme Court, however, denied the claims as procedurally defaulted under Delaware Superior Court Criminal Rule 61(i)(3) because Wes did not raise them in his direct appeal. *See Warrington*, 2006 WL 196433, at *1 n.6 & *2.

By applying the procedural bar of Rule 61(i)(3) to claims two and three, the Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263-4 (1984) that its decision rested on state law grounds. This court has consistently held that Rule 61 is an independent and adequate state procedural rule precluding federal habeas review. *See McCleaf v. Carroll*, 416 F. Supp. 2d 283, 296 (D. Del. 2006); *Mayfield v. Carroll*, 2005 WL 2654283 (D. Del. Oct. 11, 2005). Thus, the court cannot review the merits of claims two and three absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the claims are not reviewed.

Wes asserts ineffective assistance of counsel as cause for his procedural default. In order for counsel's failure to preserve a claim for review in the state courts to constitute cause for a procedural default on federal habeas review, the ineffective assistance of counsel claim must have been presented to the state courts as an independent claim and counsel's assistance must

29

have been so ineffective that it violated the Constitution. *See Edwards v. Carpenter*, 529 U.S.

446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986) (explaining that counsel's

ineffectiveness in failing to preserve a claim for review in the state courts can constitute cause for

a procedural default if the ineffective assistance of counsel claim was presented to the state

courts and counsel's assistance was so ineffective that it violated the Constitution.). The court

has already determined that trial and appellate counsel did not provide constitutionally ineffective

assistance by failing to raise claims two and three, respectively. *See supra* at pp. 9-12, 26-28.

Therefore, in this proceeding, the court cannot excuse Wes' procedural default of claims two and

three in the Delaware state courts on the basis of counsels' performance.

In the absence of cause, the court does not need to address the issue of prejudice. In

addition, Wes cannot excuse his default under the "miscarriage of justice" doctrine because he

has not provided any colorable evidence of his actual innocence. Thus, the court will deny

claims two and three as procedurally barred.

### D. Claim four: faulty jury instructions

At the end of Wes' trial, the trial court instructed the jury on the defense of justification

as follows :

> A defense raised in this case is justification . . . The defense stems from the defendants'
> assertion that, at the time in question, their actions were justified. The elements of the
> defense of justification, in this case, are as follows: (1) that the defendants were in their
> own dwelling at the time of the incident. (2) That Mr. Pecco was an intruder unlawfully
> in defendants' dwelling at the time of the incident . . . (3(b)) That the defendants
> reasonably believed that Mr. Pecco would inflict personal injury upon them . .
>
> In considering the defendants' reasonable belief . . . you may consider whether a
> reasonable man in the defendants' circumstances would have reasonably believed that the
> intruder would inflict personal injury. You should, however, keep in mind, that it is the
> defendants' state of mind which is at issue here and that it is only required that they, in

> fact, believed the intruder would inflict personal injury upon them. If, after considering all the evidence to support the defense of justification, you find that such evidence raises a reasonable doubt in your minds as to the defendant's guilt, you should find the defendants not guilty of the crime charged.

At another point in the instruction, the judge clarified,

> As to the justification defense of a person unlawfully in a dwelling, if you find Mr. Pecco an intruder unlawfully in the defendants' dwelling and if the defendant overcame Jesse Pecco so that the defendant no longer believed he was in danger of physical injury or personal injury, and therefore, the defendant knew the use of deadly force was no longer necessary, then the continued use of deadly force was not justified. In other words, if a person is initially justified in defending himself, but then knows that the danger to him has passed then the subsequent use of deadly force is not justified.

*Warrington*, 840 A.2d at 592.

On direct appeal, Wes argued that the jury instruction improperly required the defendants' reasonable belief that the intruder would inflict injury to be contemporaneous with the forceful actions taken against Pecco. The Delaware Supreme Court rejected Wes' argument, and held that the jury instruction explaining the "contemporaneous" limitation on the defense of self-defense within a dwelling correctly stated Delaware law. *Id.* at 593-4.

In this proceeding, Wes cursorily asserts that the trial court improperly instructed the jury regarding the definition of self-defense in one's own home, without explaining the error that was made. To the extent Wes argues that the jury instruction was an improper statement of Delaware law, the claim is not cognizable in this proceeding; it is well-established that "[s]tate courts are the ultimate expositors of state law,"[11] and claims based on errors of state law are not cognizable on habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

To the extent Wes argues that the jury instruction was improper under federal law, Wes

---

[11]*Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

did not fairly present this claim as an issue of federal law to the Delaware Supreme Court on direct appeal. As a result, the claim is procedurally defaulted. Liberally reading Wes' petition, the court finds that Wes appears alleges ineffective assistance of appellate counsel as cause for his failure to present this issue as one of federal law on direct appeal.

The Third Circuit has explained that,

> [in order] for the error of state law in the justification instructions, assuming that there was an error, to be meaningful in [a] federal habeas corpus action, there would have to be a body of federal law justifying the use of deadly force which is applicable in a state criminal action charging an offense based on the defendant's use of force. Then the error in the jury instructions would be significant if the instructions did not satisfy that body of law. **Put in a different way, the jury instructions on justification, even if correct under state law, would need to have relieved the state of the necessity of proving an element of the offense as required by federal law or to have deprived the petitioner of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action.**

*Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997)(emphasis added).

In this case, Wes has not identified a federal requirement that a justification instruction cannot include a provision that his use of force had to be contemporaneous with his reasonable belief that Pecco intended to harm him. Wes also has not demonstrated that the jury instruction deprived him of a defense which federal law provided to him or that the instruction violated a clearly established federal right. Therefore, the court concludes that appellate counsel did not perform deficiently by failing to raise this meritless objection to the jury instruction on direct appeal, and Wes was not prejudiced by counsel's failure to do so. As a result, appellate counsel's performance does not excuse Wes' procedural default of this claim at the state court level.

The absence of cause obviates the court's need to address the issue of prejudice.

Moreover, Wes has not provided any reason for applying the miscarriage of justice exception to his procedural default. Accordingly, to the extent Wes is challenging the justification defense as a federal issue, the court denies it as procedurally barred.

### E.  Claim five: denial of counsel at post-conviction hearing

In his final claim, Wes contends that he was improperly denied appointed counsel at his post-conviction evidentiary hearing. It is well-settled that Wes had no right to counsel in his state post-conviction hearing. *Murray v. Giarratano*, 492 U.S. 1, 7-9 (1989). It is also well-settled that claims based on alleged errors occurring during a state collateral proceeding do not provide a basis for federal habeas relief. *See Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2005). Therefore, the court will deny claim five because it fails to assert an issue cognizable on federal habeas review.

## V. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* Third Circuit Local Appellate Rule 22.2. A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Further, when a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the prisoner must demonstrate that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Slack*, 529

33

U.S. at 484.

The court concludes that Wes' petition does not warrant federal habeas relief. Reasonable jurists would not find this conclusion to be debatable. Consequently, the court declines to issue a certificate of appealability.

## VI. CONCLUSION

For the reasons stated, the court will deny Wes' petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied. An appropriate order shall issue.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT W. WARRINGTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 06-67-GMS |
| | ) | |
| PERRY PHELPS, Warden, | ) | |
| and JOSEPH R. BIDEN, III, Attorney | ) | |
| General of the State of Delaware, | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER

For the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY

ORDERED that:

1. Petitioner Robert W. Warrington's petition for the writ of habeas corpus filed pursuant

to 28 U.S.C § 2254 is **DISMISSED**, and the relief requested therein is **DENIED**. (D.I. 1.)

2. The court declines to issue a certificate of appealability for failure to satisfy 28 U.S.C.

§ 2253(c)(2) .

Dated: ___March 31___ , 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE